IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

**NANCY M. BENTLEY,**

Plaintiff,

v.

**CIVIL ACTION NO.: 5:15-CV-79
(STAMP)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On June 26, 2015, Plaintiff Nancy M. Bentley ("Plaintiff"), through counsel Travis

M. Miller, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On November 2, 2015,

the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 8; Admin. R., ECF No. 9). On December 2, 2015, and February 3, 2016,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment

and supporting briefs.[1] (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for

---

[1] On January 4, 2016, the Commissioner requested an additional thirty days in which to
file her Motion for Summary Judgment, which was granted. (Def.'s Mot. to Enlarge Time, ECF
No. 14; Order Granting Def.'s Mot. to Enlarge Time, ECF No. 15). Therefore, the
Commissioner's Motion was timely filed.

Summ. J. ("Def.'s Mot."), ECF No. 16). On February 8, 2016, Plaintiff filed a Response

to the Commissioner's brief. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), ECF

No. 18). The matter was referred to the undersigned United States Magistrate Judge for

a Report and Recommendation to the District Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned

finds that substantial evidence supports the Commissioner's decision and recommends

that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On February 29, 2008, Plaintiff protectively filed her fifth claim[2] under Title XVI for

Supplemental Security Income ("SSI") benefits, alleging disability that began on June 2,

2005. (R. 407). Plaintiff's claim was initially denied on April 18, 2008, and denied again

upon reconsideration on June 18, 2008. (Id.). After these denials, Plaintiff filed a written

request for a hearing. (R. 109). On January 28, 2010, a hearing was held before United

States Administrative Law Judge ("ALJ") Karl Alexander. (R. 55, 119). On March 11,

2010, ALJ Alexander issued an unfavorable decision to Plaintiff, finding that she was

not disabled within the meaning of the Social Security Act. (R. 75). However, after

Plaintiff requested that the Appeals Council review the ALJ Alexander's decision, the

Appeals Council vacated ALJ Alexander's decision and remanded the case for another

hearing.[3] (R. 90-94, 143, 145-46).

---

[2] Plaintiff has filed a total of six applications for SSI benefits. (R. 407). She filed her first application at the age of nineteen years. (Id.).

[3] On remand, the Appeals Council ordered the ALJ to: "[1] update the evidence on [Plaintiff's] medical conditions consistent with the requirements of 20 CFR 416.1512-1513; [2] give further consideration to [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p); and [3] obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational

On May 17, 2012, a second hearing was held before ALJ Alexander in Morgantown, West Virginia. (R. 23, 37, 152). On June 22, 2012, ALJ Alexander again determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 407). On April 10, 2013, the Appeals Council denied Plaintiff's request for review. (R. 13). Subsequently, Plaintiff appealed her case to this Court. (R. 408). The case was assigned to United States District Judge Irene M. Keeley and referred to United States Magistrate Judge John S. Kaull. See Bentley v. Comm'r of Soc. Sec., No. 1:13CV163, 2014 WL 906587 (N.D. W. Va. Mar. 7, 2014). On February 11, 2014, Magistrate Judge Kaull issued a Report and Recommendation, recommending that the case be remanded "for further discussion and analysis of whether Plaintiff's impairments meet Listing 1.02A." Id. at *25. On March 7, 2014, District Judge Keeley adopted Judge Kaull's Report and Recommendation and remanded the case for further proceedings. Id. at *1.

On October 7, 2013, while Plaintiff's case was pending before District Judge Keeley, Plaintiff filed her sixth claim for SSI benefits, alleging disability that began on October 15, 2007, instead of June 2, 2005. (R. 408). Plaintiff's claim was initially denied on November 5, 2013, and denied again upon reconsideration on May 1, 2014. (R. 583, 591). On May 29, 2014, Plaintiff filed a written request for a hearing. (R. 408). However, on June 10, 2014, the Appeals Council vacated ALJ Alexander's second unfavorable decision, consolidated Plaintiff's fifth and sixth claims for SSI benefits and remanded the case for a third hearing. (Id.).

On February 5, 2015, the third hearing was held before ALJ Jeffrey P. La Vicka in Morgantown, West Virginia.[4] (Id.). Plaintiff, represented by Mr. Miller, appeared and

_____

base (Social Security Ruling 83-12 and 83-14)." (R. 23).
    [4] The hearing was originally scheduled for October 9, 2014, but Plaintiff failed to appear

testified, as did Casey Vass, an impartial vocational expert. (Id.). On February 26, 2015, ALJ La Vicka issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 404). On or about May of 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (See R. 392-94). Afterwards, Plaintiff filed her second appeal to this Court.

## III.  **BACKGROUND**

### A.  **Personal History**

Plaintiff was born on March 10, 1973, and was thirty-four years old at the time she filed her claim for SSI benefits. (See R. 501). She is divorced and lives in an apartment with her two children, both over eighteen years of age. (R. 222, 445). She is 5'3" tall and weighs approximately 165 pounds. (R. 445). She completed school through the twelfth grade and has never received any specialized, trade or vocational training. (R. 220). She does not appear to have any past relevant work. (See R. 235, 419). She alleges that she is unable to work due to the follow impairments: (1) "problems with a bone disease;" (2) severe arthritis, constant pain and poor blood circulation; (3) peripheral vascular disease and (4) restless leg syndrome. (R. 216, 748).

### B.  **Medical History**

#### 1.  **Treatment History[5]**

---

on this date. (R. 408). However, Plaintiff established "adequate cause" for her absence and the hearing was rescheduled for February 5, 2015. (Id.).

[5] The treatment history previously discussed in Magistrate Judge Kaull's Report and Recommendation, dated February 11, 2014, will not be repeated here. To review this information, please see Bentley, 2014 WL 906587, at *2-9.

4

On October 22, 2012, Plaintiff presented to the office of Susan Miller, M.D., her primary care physician. (R. 824). During this visit, Dr. Miller noted that Plaintiff weighed 180.8 pounds. (Id.). Dr. Miller encouraged Plaintiff to lose weight and prescribed Adipex, an appetite suppressant, to help with Plaintiff's weight loss. (See R. 823-24).

On October 29, 2012, Plaintiff presented to the Orthopedic Department at United Hospital Center ("UHC") after being referred by Dr. Miller. (R. 798-00). Christopher D. Courtney, D.O., examined Plaintiff on this occasion. (R. 800). Prior to the examination, Dr. Courtney obtained Plaintiff's medical history. (See R. 798). Dr. Courtney noted that Plaintiff possessed "a history of juvenile Blount's disease with genu varum deformities," meaning that Plaintiff was bow-legged as a child. (R. 798, 837, 842). Dr. Courtney further noted that, due to her Blount's disease, Plaintiff underwent "multiple serial castings, as well as physeal stapling and osteotomies, all [of] her right [leg] with conservative treatment [of] her left [leg]." (R. 798). Finally, Dr. Courtney noted that Plaintiff suffered from chronic bilateral knee pain as a result of her childhood conditions and treatments. (Id.).

After obtaining Plaintiff's medical history, Dr. Courtney examined Plaintiff and ordered X-rays of her knees. (R. 788-90). The X-rays revealed moderate degenerative changes and chondrocalcinosis in both knees. (Id.). Subsequently, Dr. Courtney diagnosed Plaintiff with a history of Blount's disease, bilateral posttraumatic osteoarthritic changes and a history of varicose veins. (R. 800). Dr. Courtney expressed an intention to treat these conditions conservatively. (Id.). He prescribed diclofenac, an anti-inflammatory medication and analgesic, recommended that Plaintiff engage in an

"aquatic [physical therapy] program" and scheduled Plaintiff for Supartz injections for both knees. (Id.).

On November 19, 2012, Plaintiff returned to Dr. Miller's office for a routine appointment. (R. 823). During this visit, Dr. Miller documented that Plaintiff suffered from severe osteoarthritis in both of her knees. (Id.). To treat the pain from the osteoarthritis, Dr. Miller noted that Plaintiff was prescribed Lortab and would soon be receiving Supartz injections in both knees. (Id.). Dr. Miller discontinued Plaintiff's Adipex prescription. (Id.).

On November 27, 2012, Plaintiff presented to UHC's Orthopedic Department for the first of three Supartz injections. (R. 796-97). Justin Brewer, PA-C ("PA-C Brewer"), a physician's assistant, administered one injection into each of Plaintiff's knees. (Id.). Plaintiff received the second and third Supartz injections from PA-C Brewer on December 4, 2012, and December 11, 2012, respectively. (R. 793-95).

After receiving her Supartz injections, Plaintiff returned to Dr. Miller's office several times for routine appointments. (R. 818-22). On December 17, 2012, Dr. Miller noted that the Supartz injections had "helped [Plaintiff's] knees." (R. 822). She further noted that Plaintiff was planning to try "water therapy" at the Young Women's Christian Association ("YWCA"). (Id.). Dr. Miller informed Plaintiff that, in addition to water therapy, sitting in a hot tub could help with Plaintiff's pain. (Id.). On January 14, 2013, Dr. Miller documented that physical therapy would benefit Plaintiff's knees. (R. 821). Subsequently, on February 15, 2013, Dr. Miller ordered that Plaintiff participate in six to eight weeks of physical therapy. (R. 820, 826). On March 11, 2013, Dr. Miller noted that Plaintiff's knees were "still a problem" and that Plaintiff had been informed by an

orthopedic surgeon that she "need[s] to have [her] knee replaced." (R. 819). On April 8, 2013, Dr. Miller examined Plaintiff, noting symptoms of restless leg syndrome, varicose veins and non-pitting edema in both of Plaintiff's legs. (R. 818). Dr. Miller prescribed Mirapex for restless leg syndrome and referred Plaintiff to Associated Specialists, Inc. (Id.).

On May 1, 2013, Plaintiff presented to Associated Specialists, Inc. (R. 806-07). Plaintiff was evaluated by John A. Adeniyi, M.D., a vascular surgeon, for venous insufficiency in her legs. (R. 806). After an examination, Dr. Adeniyi documented that Plaintiff suffers from "some reflux . . . in the [saphenofemoral junction] bilaterally." (R. 807).

After her appointment with Dr. Adeniyi, Plaintiff returned to Dr. Miller's office for routine appointments every month for the remainder of 2013. (R. 812-17, 832-33). On May 16, 2013, Dr. Miller increased Plaintiff's prescription of Mirapex. (R. 817). On June 13, 2012, Dr. Miller documented that Plaintiff was experiencing "more problems [with] her knees" and "wants to get [a knee] replacement." (R. 816). Dr. Miller also documented that Plaintiff was trying to lose weight but was having difficulty exercising due to her knee pain. (Id.). Therefore, Dr. Miller re-prescribed Adipex. (Id.). On July 11, 2013, Plaintiff informed Dr. Miller that she was "flying to Texas" for vacation. (R. 814-15). Plaintiff further informed Dr. Miller that she was feeling anxious, for which Dr. Miller prescribed Xanax. (Id.). On August 8, 2013, Dr. Miller discontinued Plaintiff's Mirapex prescription. (See id.). On September 16, 2013, Dr. Miller noted that Plaintiff's appetite remained the same. (R. 813). On October 17, 2013, Dr. Miller discontinued Plaintiff's Adipex prescription. (R. 812). On November 12, 2013, Plaintiff complained of pain in her

knees and back and Dr. Miller changed Plaintiff's prescription of Lortab to Norco. (R. 833). On December 12, 2013, after a request from Plaintiff, Dr. Miller again prescribed Adipex to Plaintiff to help with weight loss. (R. 832).

Plaintiff continued to present to Dr. Miller's office in 2014 for routine appointments. (R. 856-63). On January 9, 2014, Plaintiff complained to Dr. Miller of chronic leg and knee pain. (R. 863). Dr. Miller examined Plaintiff, noting that Plaintiff walked with an antalgic gait. (Id.). Dr. Miller further noted that Plaintiff had lost four pounds on Adipex. (Id.). Dr. Miller encouraged Plaintiff to continue losing weight and refilled Plaintiff's prescription of Norco. (Id.). On February 6, 2014, Dr. Miller documented that Plaintiff had been unsuccessful at losing weight on Adipex and discontinued the Adipex prescription. (R. 862). On March 6, 2014, Dr. Miller noted that Plaintiff was riding an exercise bike to try to lose weight. (R. 861). On April 9, 2014, Dr. Miller refilled Plaintiff's Norco prescription. (R. 860). On May 7, 2014, Plaintiff informed Dr. Miller that her leg pain was alleviating due to the warmer weather and that she had more energy and was walking more. (R. 859). Dr. Miller noted, however, that Plaintiff was not losing weight. (Id.). On June 4, 2014, Dr. Miller documented that Plaintiff's legs were swollen and ordered that Plaintiff wear thigh high support hose. (R. 858). On July 2, 2014, Plaintiff complained of acid reflux, for which Dr. Miller prescribed Dexilant. (R. 857). On July 29, 2014, Dr. Miller documented that Plaintiff was trying to lose weight by increasing her activity. (R. 856). Dr. Miller also documented that Plaintiff was "going to Myrtle Beach" that night. (Id.).

On August 15, 2014, Plaintiff presented to UHC's Orthopedic Department for a follow-up appointment with Dr. Adeniyi. (R. 865). Prior to examining Plaintiff, Dr. Adeniyi

noted that Plaintiff had been treating her varicose veins and bilateral greater saphenous vein reflux by wearing support hose, elevating her legs and taking over-the-counter anti-inflammatory/pain medications. (Id.). During an examination, however, Dr. Adeniyi noted the presence of "large, painful varicose veins" in both of Plaintiff's legs. (R. 866). Dr. Adeniyi ordered a venous ultrasound of both of Plaintiff's legs. (Id.). After reviewing the ultrasound results, Dr. Adeniyi diagnosed Plaintiff with severe bilateral greater saphenous vein reflux and symptomatic varicose veins. (Id.). To treat these conditions, Dr. Adeniyi scheduled Plaintiff for a "greater saphenous vein closure and varicose vein excision" in her right leg. (Id.).

In August and September of 2014, Plaintiff prepared for her surgery with Dr. Adeniyi. (See R. 854-55). Plaintiff presented for two routine appointments with Dr. Miller on August 27, 2014, and September 10, 2014, during which Dr. Miller noted that Plaintiff was awaiting her "vein stripping." (Id.). Then, on September 25, 2014, Plaintiff underwent the greater saphenous vein closure and varicose vein excision in her right leg. (See R. 884).

On September 30, 2014, Plaintiff presented to the emergency room at UHC, complaining of surgical complications. (R. 884-85). Plaintiff stated that she had been "trying to stay off of [her] right leg when [her] left leg slipped and she had to catch herself with [her] right leg." (R. 885). Plaintiff further stated that she had immediately experienced pain in her right leg and that the leg had started to swell over the next day. (Id.). An X-ray and ultrasound of Plaintiff's right leg were ordered, which revealed a right knee joint effusion. (R. 881, 879, 887). An arthrocentesis was ordered to drain the fluid from Plaintiff's knee but Plaintiff "did not tolerate [the] procedure and shortly after [the]

needle entered [her] skin [she] . . . ask[ed the physician] to stop." (R. 886). After the arthrocentesis, a splint was applied to Plaintiff's right knee and she was given crutches to help with walking. (R. 889). She was also prescribed hydrocodone for her pain and referred to the Orthopedic Department. (R. 887-88).

On October 2, 2014, Plaintiff presented to UHC's Orthopedic Department for her referral appointment. (R. 892). Dr. Courtney evaluated Plaintiff on this occasion. (R. 895). Plaintiff informed Dr. Courtney that she continued to experience right knee pain. (R. 892). After an examination, Dr. Courtney diagnosed Plaintiff with: (1) a medical collateral ligament ("MCL") sprain; (2) joint effusion; (3) secondary arthritic changes in both knees and (4) a history of Blount's disease with prior surgeries. (R. 894). Dr. Courtney applied a new knee brace to Plaintiff's right knee and scheduled Plaintiff for an MRI of her right knee, which revealed the following:

> Moderate degenerative joint disease. Degenerative changes and fragmentation of the medial meniscus. Postoperative changes in the proximal tibia. There [may be] partial disruption of the anterior cruciate ligament but this is chronic as no edema is present. The medical collateral ligament maintains a normal configuration.

(R. 877, 895). Dr. Courtney also scheduled physical therapy sessions for Plaintiff. (R. 895). On October 10, 2014, Plaintiff presented for her first physical therapy session at Bridgeport Physical Therapy Services.[6] (R. 901).

Plaintiff presented for appointments with both Dr. Miller and Dr. Courtney in October of 2014. (R. 896-99, 922). On October 22, 2014, Plaintiff presented to Dr. Miller's office for a routine appointment. (R. 922). During this visit, Plaintiff informed Dr. Miller that she was attending physical therapy sessions three times

---

[6] Plaintiff appears to have attended a total of seven physical therapy sessions, stopping on November 12, 2014. (See R. 901-17).

per week. (Id.). Subsequently, on October 31, 2014, Plaintiff returned to UHC's

Orthopedic Department for a follow-up appointment with Dr. Courtney. (R. 896-

99). During this appointment, Plaintiff reported that physical therapy "seem[ed] to

be helping." (R. 896). Dr. Courtney examined Plaintiff, noting the presence of

"occasional myalgias[ ] and occasional knee pain" throughout the examination.

(R. 897). Dr. Courtney further noted that, while Plaintiff walked with an antalgic

gait, her gait had improved since her last visit. (Id.). After the examination, Dr.

Courtney diagnosed Plaintiff with, *inter alia*, degenerative changes in the left

knee and a chronic anterior cruciate ligament ("ACL") partial tear. (R. 898). To

treat these conditions, Dr. Courtney changed Plaintiff's knee brace from a hinged

brace to an unloading brace and instructed her to continue participating in

physical therapy. (R. 898-99).

In November and December of 2014, Plaintiff returned to Dr. Miller's office

for two routine appointments. (R. 920-21). On November 19, 2014, Dr. Miller

noted that Plaintiff had been wearing her brace and was continuing with her

physical therapy sessions. (R. 921). On December 17, 2014, Dr. Miller refilled

Plaintiff's prescription for Norco for her knee pain. (R. R. 920).

### 2. Medical Reports/Opinions

#### a. Physical Residual Functional Capacity Assessment by Thomas Lauderman, D.O., April 17, 2008

On April 17, 2008, Thomas Lauderman, D.O., a state agency physician,

completed a Physical Residual Functional Capacity ("RFC") Assessment form regarding

Plaintiff. (R. 290-97). On this form, Dr. Lauderman found that, while Plaintiff possesses

no manipulative, visual or communicative limitations, she possesses exertional, postural

and environmental limitations. (R. 290-94). Regarding Plaintiff's exertional limitations, Dr. Lauderman found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for at least two hours in an eight-hour workday and (4) sit for approximately six hours in an eight-hour workday. (R. 291). Dr. Lauderman further found that Plaintiff is not able to use foot controls. (Id.). Regarding Plaintiff's postural limitations, Dr. Lauderman found that Plaintiff is able to occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl and is never able to climb ladders/ropes/scaffolds. (R. 292). Finally, regarding Plaintiff's environmental limitations, Dr. Lauderman found that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat and vibrations and avoid all exposure to hazards such as machinery and heights. (R. 294). After completing the Physical RFC Assessment, Dr. Lauderman determined that Plaintiff possesses the RFC to perform light work. (R. 136).

### b. Physical RFC Assessment by Atiya M. Lateef, M.D., September 25, 2008

On September 25, 2008, Atiya M. Lateef, M.D., a state agency physician, completed a Physical RFC Assessment form. (R. 312-19). On this form, Dr. Lateef reported that, while Plaintiff does not possess manipulative, visual or communicative limitations, she possesses exertional postural and environmental limitations. (R. 313-16). Regarding Plaintiff's exertional limitations, Dr. Lateef reported that Plaintiff is able to: (1) occasionally lift and/or carry ten pounds; (2) frequently lift and/or carry less than ten pounds; (3) stand and/or walk for at least two hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 313). Regarding Plaintiff's postural limitations, Dr. Lateef reported that

Plaintiff is able to occasionally climb ramps/stairs, balance, stoop, kneel and crouch and is never able to crawl or climb ladders/ropes/scaffolds. (R. 314). Finally, regarding Plaintiff's environmental limitations, Dr. Lateef reported that Plaintiff should avoid concentrated exposure to extreme cold and vibrations and avoid all exposure to hazards such as machinery and heights. (R. 316). After completing the Physical RFC Assessment, Dr. Lateef "reduced [Plaintiff's RFC] to sedentary." (R. 319).

### c. Treating Source Statement by Sam Kuzbari, M.D., February 2, 2009

On February 2, 2009, Sam Kuzbari, M.D., Plaintiff's primary care physician at that time, submitted a Treating Source Statement. (R. 321). In this statement, Dr. Kuzbari reported that Plaintiff suffers from severe osteoarthritis in both of her knees and that, as a result of this condition, she experiences severe constant pain. (Id.). Dr. Kuzbari further reported that Plaintiff is unable to walk fifty yards or remain in a sitting or standing position for more than twenty minutes at a time. (Id.).

### d. Medical Assessment of Ability to do Work-Related Activities Physical by Sam Kuzbari, M.D., November 29, 2011

On November 29, 2011, Dr. Kuzbari performed a Medical Assessment of Ability to do Work-Related Activities Physical of Plaintiff. (R. 336-38). During this physical, Dr. Kuzbari opined that Plaintiff possesses exertional, postural and environmental limitations caused by her severe osteoarthritis of both knees and her venous insufficiency. (Id.). Regarding Plaintiff's exertional limitations, Dr. Kuzbari determined that Plaintiff is limited to lifting and/or carrying ten to fifteen pounds, standing for ten minutes in an eight-hour workday and sitting for one hour in an eight-hour workday. (R. 336-37). Regarding Plaintiff's postural limitations, Dr. Kuzbari determined that Plaintiff is able to occasionally balance and stoop and is never able to climb, kneel or crawl. (R.

337). Dr. Kuzbari further determined that Plaintiff is limited in her ability to push/pull objects. (Id.). Finally, regarding Plaintiff's environmental limitations, Dr. Kuzbari found that Plaintiff should avoid moving machinery, humidity and vibrations. (R. 338).

### e. Treating Source Statement by Susan Miller, M.D., October 17, 2013

On October 17, 2013, Dr. Miller, Plaintiff's current primary care physician, submitted a Treating Source Statement. (R. 809-11). In this statement, Dr. Miller reported that Plaintiff suffers from arthritis in both of her knees. (R. 809). Dr. Miller further reported that, due to her arthritis, Plaintiff suffers from exertional limitations and is able to lift only ten pounds occasionally and five pounds frequently. (Id.). Finally, Dr. Miller reported that Plaintiff suffers from unspecified postural limitations and no psychological limitations. (Id.).

### f. Disability Determination Explanation by Jeff Boggess, Ph.D., November 5, 2013

On November 5, 2013, Jeff Boggess, Ph.D., a state agency physician, prepared the Disability Determination Explanation at the Initial Level ("the Initial Explanation"). (R. 501-08). In the Initial Explanation, which is sparsely completed, Dr. Boggess reported that he had reviewed the record and reached the conclusion that Plaintiff suffers from a severe impairment, dysfunction of the major joints. (R. 506).

### g. Mental Status Examination by Robert V. Leydon, M.A., March 19, 2014

On March 19, 2014, Robert V. Leydon, M.A., a state agency psychologist, performed a Mental Status Examination of Plaintiff. (R. 836-40). Prior to this examination, Dr. Leydon noted that Plaintiff's chief complaints include lower leg pain and swelling, knee pain and back pain. (R. 837).

The Mental Status Examination consisted of a clinical interview and a mental assessment of Plaintiff. (R. .836). During the clinical interview, Dr. Leydon inquired regarding Plaintiff's physical health. Plaintiff informed Dr. Leydon that she suffers from knee impairments and varicose veins due to "a long history of childhood surgery for bowed legs." (R. 837). Plaintiff explained that she underwent "approximately twelve surgeries between the age of 5 and 16, where they kept breaking and resetting the bones in her legs" and that, ultimately, "plates were put in both legs." (Id.). Dr. Leydon also inquired regarding Plaintiff's mental health during the clinical interview. Plaintiff informed Dr. Leydon that she has been divorced from her husband since the year 2000 and that, while they were married, her husband was physically abusive. (R. 836). Plaintiff further informed Dr. Leydon that, while she occasionally has nightmares and feels "very nervous in crowds," her mood is "pretty good" most of the time and she has never required mental health treatment. (R. 837).

After interviewing Plaintiff, Dr. Leydon performed a thorough mental assessment of Plaintiff. (See R. 838-39). When summarizing his findings from this assessment, Dr. Leydon stated that:

> [Plaintiff] . . . presents no clinical symptoms indicative of any mood disorder. Certainly, there was trauma in the years of physical abuse . . . . However, [Plaintiff] reports that for the most part she does not think about this aspect of her past and experiences only occasional nightmares in this regard. She does indicate that she avoids grocery shopping due to having had panic attacks in stores, but she can and does go grocery shopping and does other shopping when absolutely necessary. By itself, this symptom does not rise to the level of a psychological diagnosis. . . . She does have impaired concentration[,] . . . likely due to chronic pain and impaired sleep.

(R. 840). After completing the Mental Status Examination, Dr. Leydon concluded that, while Plaintiff suffers from physical impairments, she does not suffer from a specific

psychological impairment. (R. 839). Dr. Leydon further concluded that Plaintiff's prognosis is good. (R. 840).

### h. Disability Determination Examination by Stephen Nutter, M.D., April 16, 2014

On April 16, 2014, Stephen Nutter, M.D., a state agency physician, performed a Disability Determination Examination of Plaintiff. (R. 842-46). This examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff stated that she suffers from joint pain in both of her knees. (R. 842). She further stated that she was bow-legged as a child and underwent twelve surgeries to fix the problem. (Id.). Finally, she stated that, as a result of her numerous surgeries, she suffers from varicose veins that cause her legs to swell. (Id.).

After the clinical interview, Dr. Nutter performed a physical examination of Plaintiff. (R. 843-45). The examination revealed many normal findings. (See id.). However, the examination also revealed several abnormal findings. (See id.). When summarizing those findings, Dr. Nutter stated:

> [Plaintiff] is . . . claiming problems with joint pain in her knees. She had pain, tenderness, and crepitus in the knees with reduced range of motion in the knees. There is bony deformity in the knee joints with valgus deformity as noted. Gait is a little bit abnormal. . . . There are scars on the legs from prior surgeries. . . .

(R. 846). Ultimately, Dr. Nutter concluded that Plaintiff suffers from degenerative arthritis. (Id.).

### i. Disability Determination Explanation by Thomas Lauderman, D.O., May 1, 2014

On May 1, 2014, Dr. Lauderman, a state agency physician as previously noted, prepared the Disability Determination Explanation at the Reconsideration Level ("the

Reconsideration Explanation"). (R. 556-67). In the Reconsideration Explanation, Dr. Lauderman agreed with Dr. Boggess' conclusion that Plaintiff suffers from severe dysfunction of the major joints. (R. 562). Dr. Lauderman further concluded that Plaintiff's statements regarding her symptoms and limitations are credible. (R. 563).

In the Reconsideration Explanation, Dr. Lauderman completed a physical RFC assessment of Plaintiff. (R. 563-65). During this assessment, Dr. Lauderman found that, while Plaintiff possesses no manipulative, visual or communicative limitations, she possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Lauderman found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 563-64). Regarding Plaintiff's postural limitations, Dr. Lauderman found that Plaintiff is able to occasionally climb ramps/stairs, balance, stoop, kneel, crouch, climb ladders/ropes/scaffolds and crawl. (R. 564). Finally, regarding Plaintiff's environmental limitations, Dr. Lauderman found that Plaintiff must avoid concentrated exposure to extreme cold, extreme heat and vibrations. (R. 564-65). Dr. Lauderman further found that Plaintiff must avoid even moderate exposure to hazards such as machinery and heights and that she need not avoid wetness, humidity, noises or "[f]umes, dusts, gases, poor ventilation, etc." (Id.). After completing the RDC assessment, Dr. Lauderman determined that Plaintiff is able to perform light work. (R. 565-66).

Also in the Reconsideration Explanation, Paula J. Bickham, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. (R. 562). On this

form, Dr. Bickham concluded that Plaintiff does not suffer from any mental impairments. (Id.).

### j. Treating Source Statement by John A. Adeniyi, M.D., February 4, 2015

On February 4, 2015, John A. Adeniyi, Plaintiff's orthopedist, submitted a Treating Source Statement. (R. 924). In this statement, Dr. Adeniyi reported that Plaintiff "has been under [his] care since 2014," and had initially presented with symptoms of venous insufficiency, swelling, skin changes and varicose veins in both legs. (Id.). Dr. Adeniyi further reported that, to treat her symptoms, Plaintiff had undergone a "right [leg] greater saphenous vein endovenous ablation" and that she may require the same procedure for her left leg. (Id.). Finally, Dr. Adeniyi reported that, after her surgery, Plaintiff's treatment had consisted of "conservative management with . . . support stockings as tolerated and leg elevation." (Id.).

### k. Physician's Physical Capacities Evaluation by Susan Miller, M.D., February 13, 2015

On February 13, 2015, Dr. Miller performed a Physician's Physical Capacities Evaluation of Plaintiff. (R. 925-27). During this evaluation, Dr. Miller opined that Plaintiff possesses exertional, manipulative, postural and environmental limitations due to her severe chronic pain. (Id.). Regarding Plaintiff's exertional limitations, Dr. Miller determined that, in a typical eight-hour workday, Plaintiff would not be able to stand or walk for even an hour. (R. 925). Dr. Miller further determined that Plaintiff would be able to sit for five hours total but that she would need to change positions every twenty minutes to remain comfortable. (Id.). Finally, Dr. Miller determined that Plaintiff would be limited to occasionally lifting and/or carrying up to ten pounds. (Id.).

Regarding Plaintiff's postural limitations, Dr. Miller found that Plaintiff is able to frequently "reach above" with her arms but is never able to bend, squat, crawl, climb, stoop or kneel. (R. 926). Regarding Plaintiff's manipulative limitations, Dr. Miller found that Plaintiff is limited in her abilities to push and pull with her hands and use her feet for repetitive movements, such as operating foot controls. (Id.). Regarding Plaintiff's environmental limitations, Dr. Miller determined that Plaintiff: (1) is not able to tolerate exposure to unprotected heights; (2) can occasionally tolerate exposure to marked changes in temperature, driving automotive equipment and exposure to dust fumes gases, smoke and perfumes and (3) can frequently tolerate being around moving machinery and exposure to noise. (Id.). Dr. Miller concluded her evaluation by opining that, if Plaintiff were to work, she would frequently be off task or absent and, as a result, would be an unreliable employee. (R. 927).

C.     **Testimonial Evidence[7]**

During the administrative hearing on February 5, 2015, Plaintiff testified that she suffers from physical impairments, including knee ailments and varicose veins. (R. 458-62). Regarding her knee ailments, Plaintiff was bow-legged as a child and, as a result, underwent twelve reconstructive surgeries on her legs "to make them straight." (R. 453). Her last reconstructive surgery occurred when she was sixteen years old. (R. 453-54). Due to her medical history, Plaintiff experiences "a lot of pain" in her knees. (R. 459). She states that her right knee cap "isn't . . . in the right location" and that, therefore, "it doesn't bend right." (R. 460). Plaintiff wears a knee brace to support her knee. (R. 458).

---

[7] Only the testimony offered at the administrative hearing held on February 5, 2015, will be discussed in this section. The testimony offered at the administrative hearings held on January 28, 2010, and May 17, 2012, were previously discussed in Magistrate Judge Kaull's Report and Recommendation, dated February 11, 2014. To review this information, please see Bentley, 2014 WL 906587, at *1-13.

Regarding her varicose veins, Plaintiff believes that they are the result of years of poor blood flow due to her legs being in casts from her reconstructive surgeries. (R. 462). She first noticed symptoms related to her varicose veins in 2005. (R. 461). Her varicose veins cause her legs to swell and hurt and put her at risk for blood clots. (R. 461-62). To alleviate her symptoms, Plaintiff props her legs up for an hour at a time, every three hours throughout the day. (R. 462). If she does not prop her legs up, her legs swell to the point where her feet become numb. (R. 461-62). Plaintiff underwent "varicose vein surgery" in her right leg in October of 2014 but, after the surgery, slipped and "messed up [her] right knee." (R. 453). She states that her ability to walk is now worse than it was before her surgery. (Id.). As for her left leg, she is "supposed to" undergo varicose vein surgery in her left leg in May of 2015. (R. 459).

Plaintiff testified that, because of her physical impairments, she experiences difficulty with certain activities. For example, she is unable to walk the length of a city block or sit "for any amount of time." (R. 452). She is also unable to bend or stoop. (R. 459). She states that "there [are] days [when she] get[s] up and . . . can't even walk [because her] knees just [w]on't work." (R. 466).

Finally, Plaintiff testified regarding her routine activities. On a typical day, Plaintiff awakens and performs her own personal care. (R. 455). She prepares her own meals and performs housework such as washing dishes and making beds. (R. 455-56). She uses the computer, browses Facebook and occasionally checks her email. (R. 456-57). Several times a day, she elevates her legs for an hour at a time. (R. 461-62). Three to four times a day, she walks up the ten steps in her apartment to go to her bedroom or the restroom. (R. 447-48). Once or twice a week, she visits her mother. (R. 449).

Approximately once a month, she washes laundry and babysits her five-year-old nephew during an overnight visit. (R. 456-57). Approximately twice a month, she goes shopping. (R. 455).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Casey Vass, an impartial vocational expert, also testified during the administrative hearing on February 5, 2015. (R. 467-70). Initially, the ALJ informed Mr. Vass to assume that Plaintiff is unable to perform her past relevant work. (R. 467-68). The ALJ then presented a hypothetical question for Mr. Vass's consideration. (R. 468). Specifically, the ALJ asked Mr. Vass to:

> [A]ssume a hypothetical individual of the same age, education and work experience as [Plaintiff], who retains the capacity to perform sedentary work with allowance to alternate sitting or standing positions for up to two minutes at 15-minute intervals, without going off task; who is limited to no foot control operation bilaterally. Who is limited to occasional postural, except no climbing of ladders, ropes or scaffolds; no kneeling, crouching, or crawling; who must avoid all exposure to extreme cold and heat, wetness and humidity; concentrated exposure to excessive vibration; and all exposure to unprotected heights, hazardous machinery and commercial driving.
>
> Are there jobs in the regional or national economy that such an individual could perform?

(Id.). In response to the hypothetical, Mr. Vass testified that such an individual could work as a product inspector, order clerk and small parts assembler. (Id.).

The ALJ then asked Mr. Vass several general questions. First, the ALJ asked Mr. Vass to describe the number and length of breaks that a typical employer permits during the workday. (R. 468-69). Mr. Vass testified that employers typically allow employees to take a fifteen-minute break in the morning, a fifteen-minute break in the afternoon and

thirty minutes for lunch. (R. 469). Second, the ALJ asked Mr. Vass to describe how much time a typical employer permits an employee "to be off task in addition to regularly scheduled breaks." (Id.). Mr. Vass testified that employers typically allow employees to be off task for "[t]wo percent at the work station" and that, if an employee exceeds this amount of time, his or her employment would be terminated. (Id.). Third, the ALJ asked Mr. Vass to describe how frequently an employer would allow an employee to be late to work or to "ha[ve] unexcused absences." (R. 468). Mr. Vass testified that typical employers "tolerate a day and a half a month; exceeded they would be terminated." (Id.). After answering the ALJ's questions, Mr. Vass testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 469).

Plaintiff's counsel, Mr. Miller, also presented questions for Mr. Vass' consideration during the administrative hearing. First, Mr. Miller asked Mr. Vass to consider:

> [A] hypothetical individual who because of their medical conditions had to elevate her feet in a position that the feet would be up above the heart level, and that would occur at least an hour in the morning shift and an hour in the afternoon shift[.]
>
> [W]ould that affect the performance of these jobs?

(R. 469). Mr. Vass responded that such an individual could not perform the jobs positions of product inspector, order clerk or small parts assembler and that "no job [would be] compatible with that [requirement]." (Id.). Second, Mr. Miller asked:

> In the type of work that you discuss[ed] here today, how important is reliability? And what I mean by reliability is that the employee is going to show up at the designated time that the shift starts, going to take breaks at the designated time, lunch at the designated time, and complete the workday until the end of the shift?

(R. 470). Mr. Vass responded that he "believe[s] that would go to the day and a half a month that they . . . could miss that much work, and then they're terminated if it goes over." (Id.).

### 2. Report of Contact Forms & Disability Reports

On February 19, 2008, Plaintiff completed a Disability Report. (R. 215-21). In this report, Plaintiff indicated that she suffers from "problems with a bone disease" that limit her ability to work. (R. 216). Plaintiff explained that, due to her bone disease, she is unable to lift items, stand, sit or walk for long periods of time. (Id.). Plaintiff further explained that she stopped working on June 1, 2005, because she was "[u]nable to perform [her] job duties." (Id.). Plaintiff stated that she is prescribed Lorcet for her bone disease. (R. 219). After this Disability Report, Plaintiff submitted two undated Disability Report-Appeal forms. (R. 239-45, 257-62). On these forms, Plaintiff declared that her "[c]ondition continues to get worse" and that, in addition to Lorcet, she is now prescribed Prevacid for acid reflux. (R. 239-45, 260).

On April 17, 2008, Marjorie E. Garcia, of the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form. (R. 235). On this form, Ms. Garcia reports that Plaintiff is able to perform sedentary work with walking and standing restrictions. (Id.). She further reports that, while Plaintiff has no past relevant work, she "can do a wide variety of [other] work[, sedentary in nature] . . . that do[es] not require the use of foot controls." (Id.). To illustrate, Ms. Garcia noted that Plaintiff can work as a parimutual ticket checker, lens inserter and type-copy examiner. (Id.). On September 26, 2008, Melinda Criss, also of the DDS office in

Clarksburg, West Virginia, "affirmed as written" Ms. Garcia's vocational analysis. (R. 253).

On October 8, 2013, Shelaina Jones completed a Disability Report on Plaintiff's behalf. (R. 747-58). In this report, Ms. Jones indicated that the following impairments limit Plaintiff's ability to work: (1) severe arthritis, constant pain and poor blood circulation; (2) peripheral vascular disease and (3) restless leg syndrome. (R. 748). Ms. Jones further indicated that Plaintiff stopped working on June 2, 2005, because of her conditions. (Id.). Finally, Ms. Jones stated that Plaintiff is prescribed Lorcet for pain, Catapres for restless leg syndrome and Adipex for weight loss. (R. 750).

On December 19, 2013, Ms. Jones submitted a Disability Report-Appeal form on behalf of Plaintiff. (R. 755-58). On this form, Ms. Jones indicated that, while Plaintiff had not experienced any changes in her conditions since her last Disability Report, she had received additional treatment from Dr. Miller, her primary care physician. (R. 755-56).

On May 29, 2014, Plaintiff's counsel Mr. Miller submitted a second Disability Report-Appeal form on Plaintiff's behalf. (R. 770-73). On this form, Mr. Miller indicated that Plaintiff had again received additional treatment from Dr. Miller since her last report. (R. 771).

**E. Lifestyle Evidence**

**1. Personal Pain Questionnaire, March 30, 2008**

On March 30, 2008, Plaintiff submitted a Personal Pain Questionnaire. (R. 230-34). In this questionnaire, Plaintiff declares that she suffers from pain in her legs and knees. (R. 230). She characterizes the pain as aching, stabbing, burning, stinging, cramping, throbbing and continuous in nature. (Id.). She explains that, in addition to

pain, her knees "lock up" and swell. (Id.). She states that certain activities exacerbate the pain, including walking, bending her knees and sitting for long periods of time in one position. (Id.). Alternatively, she states that elevating her legs and applying a heating pad alleviates the pain. (Id.). To treat the pain, Plaintiff states that she is prescribed Lorcet, which is "[s]ometimes" effective. (R. 231).

## 2. First Adult Function Report, March 30, 2008

On March 30, 2008, Plaintiff submitted her first Adult Function Report. (R. 222-29). In this report, Plaintiff discloses that she is limited in some ways but not others. In several activities, Plaintiff requires no or minimal assistance. (See R. 223-26, 229). For example, Plaintiff is able to perform her own personal care and care for her two children, although her mother "comes over a lot" to help care for the children. (R. 223). She is able to prepare meals, clean her house and wash laundry, although her children "help . . . a lot by carrying things up and down the stairs." (R. 224). She is able to operate a motor vehicle independently and leave her house without accompaniment. (R. 225). She is able to shop in stores and pay bills, count change and use a checkbook/money orders. (Id.). She is able get along with others without difficulty, follow written and spoken instructions and handle stress and changes to her routine. (R. 226, 229).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her leg/knee impairments. Plaintiff's impairments affect her ability to: lift, squat, stand, walk, sit, kneel and climb stairs. (R. 226). She is unable to lift or carry items because her legs cannot handle the extra weight. (Id.). Similarly, she is not able to walk the length of a mall because her right knee occasionally "give[s] out" on

her. (R. 222, 224). She explains that if she walks "a lot" on one day, she will not walk the following day. (R. 225). Due to the pain caused by her impairments, she experiences difficulty at times completing tasks, concentrating and sleeping. (R. 226). When needed, she uses crutches to help her walk. (R. 228).

Finally, Plaintiff details her routine activities. On a typical day, Plaintiff awakens then tries to "do what [she] can around the house," occasionally stopping to apply a heating pad to her knees. (R. 222, 226). In addition to performing housework, Plaintiff prepares her own meals each day. (R. 224). Frequently, she invites family and friends over to her house. (R. 226). Once a week, Plaintiff goes shopping. (R. 225).

### 3. Second Adult Function Report, July 1, 2008

On July 1, 2008, Plaintiff submitted her second Adult Function Report. (R. 246-52). In this report, Plaintiff explains that she has become more limited in her physical abilities since her last Adult Function Report. For example, Plaintiff states that she is unable to perform activities such as dancing or water aerobics. (R. 250). She estimates that she can only lift ten pounds and stand for fifteen minutes. (Id.). She further estimates that she can only walk for fifty feet before requiring thirty minutes of rest. (Id.).

Finally, Plaintiff details her new routine activities. On a typical day, Plaintiff awakens, gets dressed and prepares breakfast for herself and her children. (R. 246). Plaintiff and her children then perform housework, although Plaintiff stops to rest her legs "a lot." (Id.). After preparing lunch, Plaintiff walks "a little" outside for exercise. (Id.). Shen then watches television and goes to bed. (Id.). Two to three times a week, Plaintiff goes shopping. (R. 248).

### 4. Third Adult Function Report, January 28, 2014

On January 28, 2014, Plaintiff submitted her third Adult Function Report. (R. 762-69). In this report, Plaintiff states that she is unable to work because her legs constantly ache and "feel[ ] like [she] ha[s] bugs crawling on them." (R. 763). Specifically, she states:

> I can only stand or sit for limited time. I have trouble walking very far. I have trouble going up [and] down steps. I am in constant pain so it's hard to focus. My legs become [swollen] so I [need] to keep them elevated a lot throughout the day. I cannot lift [or carry] anything heavy . . . . I cannot sit very long with my feet hanging down.

(Id.).

Plaintiff explains that she is very limited in her physical abilities. Plaintiff's conditions affect her ability to: lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs. (R. 767). While Plaintiff is able to perform light housework, she can only do it "for about 20 [minutes]" at a time before she needs to sit and elevate her legs. (R. 764). Because of her inability to perform sustained activity, shopping is difficult for Plaintiff. (R. 763). She estimates that she can only walk for fifteen minutes before requiring rest. (R. 767). Due to the pain caused by her impairments, Plaintiff experiences difficulty concentrating, completing tasks and memorizing information. (Id.). She is also "moody due to the constant pain" and does not handle stress or changes to her routine well. (R. 767-68).

Finally, Plaintiff details her new routine activities.[8] On a typical day, Plaintiff awakens, gets dressed and performs light housework, including helping her daughter

---

[8] On two undated forms entitled "Claimant's Medications," Plaintiff indicates that her daily medications include: (1) Cataflam for swelling, pain and stiffness; (2) Lorcet/Lortab for pain; (3) Adipex for weight loss; (4) Zyrtec for allergies and (5) Prevacid for acid reflux. (R. 264-65). In addition to these medications, Plaintiff is prescribed a cane for walking and thigh-high support

wash laundry. (R. 763). Throughout the day, she sits down and elevates her legs. (Id.).

During the spring and summer, Plaintiff goes outside four to five times per week,

although she stays inside during the winter. (R. 765). Once a week, Plaintiff goes

shopping. (Id.). She frequently invites her mother to her house and occasionally visits

her siblings. (R. 766-67).

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step

sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of
> our listings . . . and meets the duration requirement, we will find that you
> are disabled.

---

hose, both of which she uses every day. (R. 767-68).

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.     The claimant has not engaged in "substantial gainful activity" at any time during the "period at issue" herein, i.e., since the October 15, 2007, date of alleged disability onset (20 CFR § 416.920(b)).

2.     During the period at issue, the claimant has evidenced the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months; degenerative joint disease, bilateral knees;

and varicose veins/history of deep venous thrombosis, bilateral lower extremities (20 CFR § 416.920(c)).

3. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 416.920(d), 416.925 and 416.926).

4. Throughout the period at issue, the claimant has had at least the [RFC] to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; within intervals of 15 minutes, affords the option to alternate between sitting or standing for up to 2 minutes, without breaking task; requires no operation of foot controls; requires no crawling, no crouching, no kneeling, climbing of ladders, ropes or scaffolds, and no more than occasional balancing, stooping, or climbing of ramps or stairs; requires no commercial driving; and entails no exposure to temperature extremes, wetness, humidity, excessive vibration, unprotected heights or hazardous machinery (20 CFR §§ 416.920(e) and 416.967(a)).

5. Throughout the period at issue, the claimant has lacked the ability to perform the requirements of any "vocationally relevant" past employment (20 CFR § 416.965).

6. The claimant is considered for decisional purposes as a "younger individual age 18-44" (20 CFR § 416.963).

7. The claimant has attained a high school education and is able to communicate in English (20 CFR § 416.964).

8. Considering the claimant's age, level of education, work experience and prescribed [RFC], she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy. Therefore, a finding of disability is appropriately reached within the framework of any of Medical Vocational rules 201.27, 201.28 and 201.29 (20 CFR §§ 416.960(c) and 416.966).

9. The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since October 15, 2007 (20 CFR § 416.920(b),(g)).

(R. 411-21).

# VI.   DISCUSSION

## A.   Contentions of the Parties

Plaintiff contends that the Commissioner's decision contains errors of law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ failed to: (1) adequately consider Listing 1.02A; (2) consider and discuss relevant medical evidence and (3) explain what weight he accorded Dr. Adeniyi's Treating Source Statement. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1, ECF No. 13). Plaintiff requests that the Court remand the case for the calculation of benefits or, alternatively, remand the case for further proceedings. (Pl.'s Mot. at 1).

Alternatively, Defendant contends that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) thoroughly reviewed the evidence and correctly determined that Plaintiff's impairments do not meet or equal Listing 1.02A and (2) adequately discussed Dr. Adeniyi's Treating Source Statement. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 10, 15, ECF No. 17). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

## B.   Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is

not supported by substantial evidence. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Id.</u> (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.  Whether the ALJ Adequately Considered Listing 1.02A**

Plaintiff contends that the ALJ erred in determining that Plaintiff's impairments do not meet Listing 1.02A by failing to abide by this Court's specific instructions to compare Plaintiff's actual symptoms to the requirements of Listing 1.02A upon remand.[9] (Pl.'s Resp. at 2). Specifically, Plaintiff contends that the ALJ focused solely on whether Plaintiff met the requirement of being unable to ambulate effectively and disregarded the other requirements of Listing 1.02A. (<u>Id.</u>). Defendant contends that the ALJ properly

---

[9] When recommending remand, Judge Kaull determined that ALJ Alexander had erred in stating in a conclusory manner that Plaintiff did not meet the requirements of Listing 1.02A. <u>Bentley</u>, 2014 WL 906587, at *24-25. Specifically, Judge Kaull determined that, in his reasoning, ALJ Alexander had simply restated verbatim the language of Listing 1.02A, without engaging in any analysis of his own. <u>Id.</u> Therefore, the case was remanded "for further discussion and analysis of whether Plaintiff's impairments meet Listing 1.02A." <u>Id.</u> at *25.

concluded that Plaintiff's impairments do not meet or medically equal Listing 1.02A. (Def.'s Br. at 10).

At step three of the sequential evaluation process, a claimant bears the burden of proving that his or her medical impairments meet or equal the severity of an impairment recorded in the "Listing of Impairments," located at 20 C.F.R. Part 404, Subpt. P, App. 1 (2015). Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The duty of the ALJ is to identify the relevant listings and then compare the criteria of each listing "to the evidence of the claimant's symptoms," in more than a summary way. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir.1986). In other words, the "ALJ is required to give more than a mere conclusory analysis of the [claimant's] impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009). If a claimant meets his or her burden at step three, then the claimant "establishes a prima facie case of disability." Id.

Listing 1.02A, the only contested listing in this case, applies to claims for disability based upon a "major dysfunction of a joint." 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.02A. Specifically, Listing 1.02A states:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id. Listing 1.00B2b, cited in Listing 1.02A, provides:

> b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. at § 1.00B2b.

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff's impairments fail to meet or equal Listing 1.02A. At step three of the sequential evaluation process, the ALJ determined that Plaintiff does not suffer from a major joint dysfunction because she does not meet any of the criteria of Listing 1.02A. (R. 413). Specifically, the ALJ determined that Plaintiff does not possess: (1) a gross anatomical deformity; (2) chronic joint pain and stiffness with signs of limitation of motion, or other abnormal motion of the affect joint(s), and findings of joint space narrowing, bony destruction or ankylosis or (3) an inability to ambulate effectively. (Id.).

The ALJ detailed his assessment of whether Plaintiff's impairments meet or equal Listing 1.02A over the course of four pages. (R. 412-15). Specifically, the ALJ

noted, *inter alia*, the following facts relating to his determination that Plaintiff does not possess a *gross* anatomical deformity:

> At [a] consultative physical examination on April 16, 2014, [Plaintiff] was . . . described [by Dr. Nutter as possessing] knees of somewhat Hallux deformity, 'kind of knocked kneed.' Her feet were noted to turn 'slightly inward a little bit' with appearance of a 'slight varus deformity of the right ankle' when she walked. . . . Knee examination elicited complaint of pain and tenderness bilaterally, with crepitus noted and valgus deformity at 20 and 15 degrees on the left and right, respectively.

(R. 414-15). The ALJ further noted, *inter alia*, the following information pertaining to his determination that Plaintiff does not possess chronic joint pain and stiffness with signs of limitation of motion, or other abnormal motion:

> Judge Alexander noted [in June 2012] that, although an orthopedist had reportedly suggested that [Plaintiff] could undergo surgery, she continued to treat primarily with her family physician by injection therapy and chronic narcotic medications which suggests, in the absence of fully convincing objective medical findings to the contrary, that her alleged pain is tolerable with conservative treatment . . . . [On April 16, 2014, Dr. Nutter noted that] her gait was 'not unsteady, lurching or unpredictable' and . . . that she did not require a handheld assistive device. She was observed to be stable at station and comfortable in both supine and sitting positions . . . . [She] evidenced 5/5 muscle strength in the lower (and upper) extremities, with 'no evidence of atrophy noted.' She was able to stand on one leg at a time without difficulty and had no hip joint tenderness. Achilles deep tendon reflexes were symmetrical. [She] was able to walk on the heels and toes and perform tandem gait. She demonstrated inability to squat because of knee pain . . . .

(Id.). Finally, the ALJ noted, *inter alia*, the following evidence concerning his determination that Plaintiff is able to ambulate effectively:

> At a consultative psychological evaluation on March 19, 2014, [Plaintiff] was noted to endorse use of a cane 'for walking longer distances' but was observed as not needing to use a cane to walking inside from her car parked in front of the building. She offered to the evaluating psychologist at that time that she had 'used to be able to walk the length of the mall' but that she could no longer do so. The [undersigned] observed that [Plaintiff] offered a similar assertion on a function report that she complied in January 2014. She wrote that she used 'to be able to walk the length of

the mall' but had not been able to do that 'for awhile.' In that [Plaintiff] has filed for disability benefits six times since 1992 at age 19, such statement suggests that she was seeking such benefits even when she was purportedly possessed of much greater functionality. It would appear that she was seeking benefits while still able to shop and walk the length of a mall. Such statements tend to diminish her credibility . . . . At a consultative physical examination on April 16, 2014, [Plaintiff] was observed by Dr. Nutter to ambulate with a gait that was 'a little painful' and further described as 'not really limping' . . . .

[Plaintiff] ambulated unassisted from her vehicle indoors to a psychological evaluation in March 2014. She was noted in April 2014 to ambulate without an assistive device. Her statements indicate that she was driving a vehicle as recently as October 2014 and the undersigned has found no compelling evidence of any such injury that month that would preclude her ability to drive or ambulate for 12 consecutive months. In May 2014 she was noted to be relying on Norco . . . to report 'less painful' legs and to have 'more energy' because she was 'walking more' . . . . [10]

[Plaintiff] related in January 2014 that she . . . helped her daughter 'do laundry & some light housework.' She wrote that shopping was 'very hard' but that she nonetheless continued to do so.

(Id.) (internal citations omitted). Therefore, the ALJ's comparison of Plaintiff's symptoms to the criteria of Listing 1.02A was not a mere conclusory analysis. To the contrary, the ALJ thoroughly detailed Plaintiff's symptoms when comparing them to the criteria of Listing 1.02A.

Plaintiff argues that the ALJ focused solely on whether Plaintiff met the requirement of being unable to ambulate effectively and disregarded the other requirements of Listing 1.02A. (Pl.'s Resp. at 2). The undersigned disagrees. However, assuming *arguendo* that the ALJ neglected to consider all of the criteria of Listing 1.02A, any error on the part of the ALJ would be harmless in nature because the ALJ

---

[10] Plaintiff argues that the information contained in this paragraph is irrelevant for determining whether Plaintiff is able to ambulate effectively. (Pl.'s Br. at 9). Regardless of whether this is true, the undersigned finds that the ALJ's determination that Plaintiff is able to ambulate effectively is supported by other relevant evidence amounting to substantial evidence.

unquestionably determined that Plaintiff failed to meet the requirement of Listing 1.02A

that she be unable to ambulate effectively, a decision that the undersigned finds is

supported by substantial evidence. Consequently, the undersigned finds that Plaintiff's

argument that the ALJ failed to adequately consider Listing 1.02A lacks merit.

### 2. Whether the ALJ Considered and Discussed the Relevant Medical Evidence

Similar to her first contention, Plaintiff argues that the ALJ failed to consider and

discuss clearly relevant medical evidence when determining whether Plaintiff's

impairments met or medically equaled Listing 1.02A. (Pl.'s Br. at 11). Specifically,

Plaintiff argues that the ALJ failed to consider and discuss, *inter alia*, "X-ray and MRI

evidence[,] . . . three orthopedic specialists' records [and Plaintiff's] . . . vascular test

results."[11] (Id. at 12). Defendant argues that the ALJ thoroughly reviewed the evidence

before him. (Def.'s Br. at 10).

An ALJ is required to *consider* all of the relevant medical evidence submitted by

a claimant. 20 C.F.R. § 416.920. However, an ALJ is "not obligated to *comment on*

every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71,

2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating

that "there is no rigid requirement that the ALJ specifically refer to every piece of

evidence in his decision"). Instead, an ALJ's decision need only "contain a statement of

the case, in understandable language, setting forth a discussion of the evidence, and

stating [his or her] determination and the reason or reasons upon which it is based."

Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). In other words, an ALJ

---

[11] Plaintiff argues that the ALJ erred in failing to discuss "a single X-ray . . . [or] MRI report" when determining whether Plaintiff's impairments met or equaled Listing 1.02A. (Pl.'s Br. at 7). However, Plaintiff cites to no authority stating that the ALJ was required to do so.

need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). Therefore, if an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word." Reid, 769 F.3d at 865.

In the present case, the undersigned finds that the ALJ considered all of the relevant evidence when he determined that Plaintiff's impairments fail to meet or medically equal Listing 1.02A. In his decision, the ALJ stated that he had carefully considered the entire record when proceeding through the five-step evaluation process. (R. 411). The ALJ also stated that, when determining whether Plaintiff's impairments met or medically equaled a listing, he "particularly evaluated medical and other evidence pertaining to [Plaintiff's] medically determinable impairments in conjunction with all relevant severity criteria contained within [Listing 1.00, including Listing 1.02A]." (R. 412). Because no evidence exists to refute the ALJ's statements, the undersigned will accept these statements as true.

The undersigned further finds that the ALJ sufficiently discussed the relevant medical evidence and his reasons for determining that Plaintiff's impairments do not meet or medically equal Listing 1.02A. When determining whether Plaintiff's impairments met or medically equaled a listing, the ALJ provided a detailed and thorough discussion of the evidence over the course of several pages. (R. 412-15). For example, the ALJ discussed, *inter alia*, Plaintiff's testimony from her most recent administrative hearing, Dr. Miller's treatment notes, Dr. Nutter's Disability Determination Examination, Dr. Leydon's Mental Status Examination and Plaintiff's Third Adult

Function Report. (R. 414-15). The ALJ then reasoned that the "foregoing [discussion of evidence does not] . . . establish any condition of a severity to satisfy the A criteria of [L]isting 1.02." (R. 415). While the ALJ did not comment on every piece of evidence presented, he was not required to do so. Instead, the ALJ was only required to provide a minimal level of analysis to allow a reviewing court to follow his reasoning, which the ALJ supplied. Consequently, the undersigned finds that Plaintiff's contention that the ALJ failed to consider and discuss clearly relevant medical evidence is without merit.

### 3. Whether the ALJ Properly Evaluated Dr. Adeniyi's Treating Source Statement

Plaintiff contends that the ALJ failed to specify what weight he accorded to Dr. Adeniyi's Treating Source Statement and "failed to address in any way the limitations set forth" within it. (Pl.'s Br. at 12). Defendant contends that the Treating Source Statement fails to qualify as a medical opinion and that, therefore, the ALJ was not required to treat it as such or assign any weight to it. (Def.'s Br. at 15). Plaintiff disagrees, arguing that Dr. Adeniyi opined that Plaintiff needs to elevate her legs "to reduce the swelling and pain." (Pl.'s Resp. at 7).

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). "Medical opinions" are defined as "statements from . . . acceptable medical sources that reflect *judgments* about the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. § 416.927 (emphasis added). Medical opinions include judgments regarding "[the claimant's] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." Id.

In the present case, the ALJ determined that Dr. Adeniyi's Treating Source Statement did not qualify as a medical opinion. (R. 419). Initially, the ALJ noted that:

> [Dr. Adeniyi] indicated [in the Treating Source Statement] that he had only started treating [Plaintiff] in 2014. He noted that she 'presented' with signs and symptoms of bilateral lower extremity venous insufficiency with recurrent swelling, skin changes and varicose veins. She was noted to have undergone right greater saphenous vein endovenous ablation to 'help improve her symptoms' and as possibly requiring the same procedure for her left lower extremity. However, he described her as requiring only 'conservative' management with support stockings as tolerated and 'leg elevation' to reduce 'the swelling and pain.'

(Id.) (internal citations omitted). The ALJ then reasoned that these statements do not "indicate any opinion of permanent and total disability."[12] (Id.).

The undersigned finds that the ALJ did not err in determining that Dr. Adeniyi's Treating Source Statement does not qualify as a medical opinion. While Plaintiff argues that Dr. Adeniyi opined in the Treating Source Statement that Plaintiff needs to elevate her legs "to reduce the swelling and pain,"[13] Plaintiff is mistaken in her interpretation of Dr. Adeniyi's remark. (Pl.'s Resp. at 7). In the Treating Source Statement, Dr. Adeniyi stated that Plaintiff "is [currently] on

---

[12] Plaintiff argues that the ALJ erred in implying that a statement must indicate permanent and total disability to qualify as a medical opinion. (Pl.'s Br. at 13 n.7). The undersigned agrees. See 20 C.F.R. § 416.927 (declaring that statements that a claimant is "disabled" or "unable to work" do not qualify as medical opinions). However, such error was harmless in nature. While the ALJ's reasoning may have been incorrect, the ALJ's decision to not treat the Treating Source Statement as a medical opinion is supported by substantial evidence, as will be discussed below. See Norman v. Comm'r of Soc. Sec., No. 2:14-CV-33, 2014 WL 5365290, at *20 (N.D. W. Va. Oct. 21, 2014) (declaring that, when an error is inconsequential to the ultimate disability determination, the error is harmless in nature).

[13] Plaintiff does not argue that any other of the other assertions in the Treating Source Statement qualify as medical opinions. Nevertheless, the undersigned has examined Dr. Adeniyi's statement that Plaintiff presented to his office in 2014 "with signs and symptoms of bilateral lower extremity venous insufficiency." (R. 924). The undersigned notes, however, that this statement reflects Dr. Adeniyi's mere observations, not a definitive confirmed diagnosis. Therefore, the statement does not qualify as a medical opinion. See McDonald v. Astrue, 492 F. App'x. 875, 884 (10th Cir. 2012) (stating that documents reflecting clinicians' observations of a claimant's symptoms do not qualify as medical opinions).

conservative management [of her venous insufficiency] with Class I to II graduated support stockings as tolerated and leg elevation to reduce the swelling and pain." (R. 924). This statement merely reflects Plaintiff's treatment plan. It does not reflect a judgment regarding the severity of Plaintiff's symptoms or describe what Plaintiff can still do despite her impairments. It does not even reflect that Plaintiff is restricted from performing any activities due to her treatment. Therefore, the statement does not qualify as a medical opinion.

Nevertheless, assuming *arguendo* that Dr. Adeniyi's Treating Source Statement qualifies as a medical opinion, the ALJ's failure to treat it as such is harmless in nature. See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."). The ALJ did not disregard the Treating Source Statement because it did not qualify as a medical opinion. To the contrary, the ALJ considered and discussed each of Dr. Adeniyi's assertions contained in the Treating Source Statement. (R. 419). For this reason, the undersigned finds that, had the ALJ considered Dr. Adeniyi's Treating Source Statement as a medical opinion, the ultimate nondisability determination would not be any different.

Plaintiff argues that the ALJ's failure to consider the Treating Source Statement as a medical opinion is not harmless error because the ALJ failed to address the limitations set forth in the Treating Source Statement, specifically that Plaintiff must elevate her legs to reduce swelling and pain, in the RFC

assessment. (Pl.'s Br. at 14). The undersigned finds little merit to this argument. In the RFC assessment, the ALJ declared that he had considered Plaintiff's "base contention that she cannot work because of pain, numbness or a need to elevate her legs" but opted to omit it from the RFC determination. (R. 418). The ALJ explained that "he was entirely disinclined to credit" Plaintiff's contention due to, *inter alia*, her routine activity level. (Id.). No statement in the Treating Source Statement conflicts with the ALJ's determination to exclude Plaintiff's need to elevate her legs in the RFC. Dr. Adeniyi did not opine that Plaintiff's must elevate her legs so frequently or for so long a duration as to preclude her from working or performing any other activities. Consequently, the undersigned finds that Plaintiff's argument that the ALJ erred in his treatment of Dr. Adeniyi's Treating Source Statement is without merit.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED,** the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be

submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 2nd day of June, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE